We'll begin with the Tri-State case, and this has been a work in progress. Five petitions for review that we then sorted into two argument slots of our six cases. And now it is distilled further, consolidated into one argument, which makes sense. We appreciate the council's help in getting it in a way that we can resolve it the easiest and hear the arguments the best. So my understanding is that the way that this will proceed is Tri-State will lead off and has 25 minutes allotted, which it wants to try to reserve three minutes. Sometimes that works, sometimes it doesn't. Then five minutes for intervener petitioner based in electric, 25 minutes for FERC, and five minutes for intervener respondent United Power. If I got it right, anybody raise your hand if I'm out to lunch, and you've raised your hand, but you were taking your purse off. I won't count that one. That being the case, I think we are ready to proceed. And so, council, when you're ready, we're ready for you. Thank you, Your Honor. Misha Zaitlin for the petitioner. I am going to try to reserve five minutes for rebuttal, but we'll see how that goes. Understood. I represent Tri-State, a non-for-profit generation intermission cooperative, and I'm here speaking for our cooperative members who serve customers in Western states. Our cooperative members each contractually agreed to take all the requirements of their power from Tri-State until 2050. These long-term commitments are the backbone of our cooperative, as this court explained in this shown case. In setting a contractual termination payment methodology, FERC entirely failed to set a just and reasonable rate under the Federal Power Act for three fundamental reasons that I will discuss today. First, FERC's methodology gives no weight and pays no account to the fact that these are long-term contractual commitments. That is a fundamental violation of the Federal Power Act and the APA. Clearly, the fact that these are long-term commitments is an important consideration, and the fact that FERC's methodology gives us no weight, gives the exact same number, regardless of whether the West has three years left on it or 40, is just a clear error of law requiring vicature on that basis alone. Second, the methodology that FERC adopted, which is a single-minded focus on a snapshot of our balance sheet, current balance sheet, unquestionably shifts costs to remaining members. Now, while there is some disagreement around the margins here, most of the points on this aspect of the case are undisputed. They do not dispute that a methodology is not just and reasonable if it shifts costs. Further, they do not dispute that 2 thirds of our costs are not reflected on our debt, on our balance sheet. So they do not account for 2 thirds of our costs. The only answer for ignoring 2 thirds of our costs is that we'll be able to right-size away, which is operationally change, to get rid of some but not all of those costs. Now, how much some but not all, we can debate. But since it's undisputed that at least some costs can't be right-sized away, and it's further undisputed that a just and reasonable methodology must not shift costs, that is a clear error that requires vicature on that basis alone. When you're talking about this 2 thirds of costs, what do you mean by costs? Are you talking about debt? No. So 1 third is debt. That's the part that they account for, although with regard to transmission debt, they kind of mess that up, too, by things that I can discuss later. But for the 2 thirds, this is environmental mediation, labor costs, safety and training, systems operation, maintenance, compliance. They do not account for it at all in their calculation. Again, their only, only answer is this right-sizing point. But they don't, in their orders or in their brief, say that we can right-size away all the costs. Obviously, some can be right-sized, some can't. And since it is undisputed, as I read the orders and review in their brief, that some of the costs, the 2 thirds, can't be right-sized away, that's a cost shift that they don't account for. They admit that a just and reasonable methodology cannot shift costs, and that's reason alone to set aside the orders and review. And the third point is that they, by adopting this balance sheet approach, they did something with us and with our contracts that they've never done with any other cooperative or any other contract that they can point to. So adopting a methodology different for one set of contracts and one cooperative than you do for anyone else, that violates the APA unless you can give a good reason. And the only true reason they give for this methodology that they're adopting in their brief and in the orders are just red herrings. They say, well, there's an issue with patronage capital. Patronage capital needs to be refunded under any approach. So that's a red herring as to why you'd want the balance sheet approach versus loss-revenue approach or any other approach. That doesn't justify doing something different as to us. And their other point is that the departed member could still take some of the transmission services. That doesn't justify adopting the balance sheet approach. We accounted for that in our approach. It could be accounted for in a different approach. And in fact, the way they did the transmission with the crediting is a complete mess as we talk about in both sets of appeals. How does the open access transmission, how does that relate to the costs? In other words, if the departing members do indeed avail themselves of that, does that weaken or undermine your argument about the two-thirds cost? No, no, so the open access aspect, as it relates to the credit as well, that has to do with the portion that they're paying for our debt to build the transmission wires and the substations and things of that sort. So that is not accounted for, and that's not the two-thirds that we're saying is unaccounted for. We do have a very significant problem with how they've changed the transmission credit. So even with regard to that one-third, it's not even close to one-third or the way they've structured the credit, but that's downstream of if the court approves their overall methodology that I'm happy to talk about. But the two-thirds is not that. That's the transmission debt and things of that sort that deals with the one-third. From your comment, as I understood it, you're not saying that lost revenues is the only just and reasonable approach. You're just saying that the particular approach chosen here is not just and reasonable. We certainly believe that the fundamental principles underlying the lost revenue approach, which is that you need to keep remaining members whole, and by whole, you have to see what the revenue stream is to be expected minus the amounts that can be mitigated. We do think that that is required. Having said that, if the court thinks that's not right, we still prevail because there's two aspects of FERC's orders here. One is the 205 order, which is they rejected what we submitted, and that was our burden to prove that that was just and reasonable. Is that challenged, by the way, the rejection of that? We challenge, let me say it very carefully. We challenge their rejection of the lost revenue approach methodology. We do not challenge every specific criticism they had of the specific variant of the lost revenue approach that we submitted to FERC. So we're asking the court here today for an order setting aside both these orders and directing that they adopt the exact, with all the commas and periods of our lost revenue approach. We are asking, however, that the court make clear that the principles underlying the lost revenue approach must govern a just and reasonable methodology. If this court is not willing to go there, you know, at least set aside. Excuse me. Sorry. Wasn't it FERC's position that the reason that they didn't see the lost revenue is because your contract, unlike the contracts in many of the other cases, allowed for withdrawal from the cooperative without, well, we calculated penalties, and so a breach of contract theory like lost revenue FERC decided was not appropriate here. Well, I will say, I don't read their orders to say that our WESCs allow for early quitting of the WESC, but if your honor reads their orders that way, then that would just be very clearly wrong. You know, I would ask the court to look at our WESCs on volume one appendix 101 through 111. It is clear as day that that says you have to take all your requirements until 2050, then you can give two years notice and no longer be part of the contract. If you're reading their orders as saying that there is no requirement to stay in that contract to 2050, and I don't read their orders that way, but if that's what they're saying, then that would be yet another reason to vacate their orders under review, because there is just no way, no way possible to read the WESC as saying anything like that. To follow up with Judge McHugh's question, are you saying that there's a breach of contract? No, your honor, just like in the Norwood litigation that went to the First Circuit, the parties here, just like the New England Power Company in Norwood, came to FERC to resolve how to get out of the contract in a just and reasonable manner. So you don't need a breach of contract methodology, and I think the verbiage, I think that the breach of contract verbiage tends more to obscure than to enlighten. You can put aside that wording and say it's reliant, contracts for reliance interests. It all leads to the same result. Different parties, different contract in Norwood. It's not exactly an overlap here. The principle is the same, though. I mean, Norwood, the First Circuit says in Norwood the fact that the methodology approved by FERC, just and reasonable, looks like it damages calculation of a contract, is not a problem. That's what the First Circuit said. So I don't want to get wrapped up around the axel of saying this is a damages or things of that sort. The bottom line is that, and FERC concedes, a just and reasonable methodology has to avoid cost shift. In a cooperative context, as this court well explained and has shown, cooperative context, not shifting costs, means honoring the expectations of the other members of the cooperative. Counsel, if you're relying on contractual principles and saying that the commission failed to honor your contractual principles, where in your bylaws or the energy services contract should we look to to extract these principles? Because I looked, I may have missed it, to see if there was anywhere written down that spoke to a methodology for termination payment. Right, so the WESCs, which I just spoke about, excuse me, do not allow for an exit before 2050. After 2050, if you give two years notice. What about the bylaws? The bylaws allow an exit from the cooperative. And in fact, the bylaws say that the exit, that even if the board approves your exit, you still have to honor your contracts. So under the bylaws, the WESC isn't terminated. Now, as a practical matter, the board, which is the counterpart of this contract, has in fact negotiated, in tandem with member exits, a reasonable way to allow members to get out of their WESC contracts. But as a matter of the plain text of the bylaws. Is there anywhere in the bylaws or the WESC contract where it requires the loss revenue methodology? No, Your Honor. That has to be a just and reasonable methodology. And FERC concedes, in its brief here, and in the orders, that a just methodology must not shift costs to remain in members. They concede that. They then concede that their balance sheet approach does not account for 2 3rds of our costs. Their only answer is right-sizing will deal with some of the 2 3rds of that, which means that some of that 2 3rds, we think most of that 2 3rds, is not accounted for. That's a cost sum. You admit that right-sizing will account for some of those. For some of them, and in our methodology, we have some mitigation measures. In the more complex formula we first submitted to FERC, we had even more mitigation. And they turned that down because they said, well, that was too hard to understand. But certainly on remand, FERC can adopt a methodology that doesn't shift costs that includes more mitigation than we submitted in our simplified loss-driven approach. But what they absolutely can't do is say, we're gonna adopt a methodology that only accounts for 1 3rd of your yearly costs. Then for the 2 3rds of costs, we're gonna wave our hands and say, you can right-size some of those, so that's not a problem. In their brief here, they say, well, they can right-size many of our costs away. They're careful lawyers, that's the reason they said many, because they know they can't say all. And we think it's not even close to all, and we think it's not even close to most. But regardless of what that is, they have shifted costs to us by adopting this completely unprecedented, myopic methodology that only focuses on 1 3rd of our yearly costs. That's a cost shift. Now with regard to contracts, it is true, Your Honor, and this is an independent argument from my cost shift argument, that we don't have a contractual term here that allows for an early termination, which means that you can't terminate. So in order to allow for getting out of the most important term of the contract, which is the years, the FERC had to pay due respect to contractual principles, and that's under the Morgan Stanley case. That doesn't mean they have to adopt a damages methodology, but they have to give that due respect. They gave that no respect, no weight whatsoever. You get the exact same calculation for your exodus fee under FERC's methodology. If you've got 40 years left on your West or three years, they give that no weight, and giving no weight to a mandatory consideration, as announced by the U.S. Supreme Court, is a clear violation of the Federal Power Act, and it's also textbook arbitrary and capricious rulemaking under State Farm. State Farm says that if there's an important aspect of the problem, you must reasonably consider it. Surely, and as this court's decision should show and well shows, the length of the commitment, which is the fundamental commitment that allows us to plan the future both to taking on debt, to construct generation and transmission facilities, and to fund those yearly two-thirds operations, is the length of the contract. To give that not some way, not weight compared to other factors, but to give that zero weight, to have a methodology that doesn't care about that is a clear violation of the Federal Power Act and the APA, and on remand, if they want to try something, if they want to give a shot at something else, not lost revenue, not BSA, we can take a look at that, but what that can't do is give no weight to the long-term nature of these agreements. Council, one of the responses of the commission is that, or purposes of their methodology as they explain it, and as I understand it, is their concern that Tri-State is essentially gonna receive a windfall, or more than would be otherwise gained without the termination, and I hear your argument to be that their methodology is not just gonna not make you whole but it's not gonna make you close to whole. That's right. So that's a pretty large gap here in the methodology. So can you help me understand why the commission is wrong about their concern or purpose of Tri-State receiving more than would otherwise be due? Yeah, I mean, I think ultimately their problem isn't the lost revenue approach in that class. I think they're just not happy with how we calculated both the default and the mitigation on that. I think, and I'll hear what they have to say on rebuttal, I think if the revenues that were expected are fully calculated, and then the mitigation measures that we reasonably can take are fully calculated, it can't be said that we have a windfall. Now in the first version of the lost revenue approach. Let me stop you there. Didn't the ALJ calculate that if every member were to withdraw, Tri-State would generate 9.1 billion nearly double its total assets of 4.9 billion and nearly double its total liabilities of 4.9 billion. And it would nearly triple its total debt of 3.97 billion. I mean, it seems to me one of your problems here is maybe you reached too far on your first proposal. Well, if you- And ALJ found that it was not reasonable judging reasonable. Well, you know, a couple of responses to that. One is just hypothetical of everyone withdrawing from a cooperative. There's no cooperative then. It doesn't exist anymore. We're just done. We don't have an independent existence. We're a nonprofit. But to the extent that the ALJ has a point there, and that we overreached or whatever, especially in our second submission where we had to take out our mitigation measures because they thought they were too complicated. Well, then we'll lose our 205 case, but we certainly win our 206 case. We certainly, if what we submitted was reaching too far, didn't build in enough mitigation, had the rates are too high, didn't sufficiently account for the variability in the demand that the departed member would have, or rule against us on the 205 appeal, but then we absolutely must win under the 206 appeal. Even if we overreached in our submission, it then under 206 becomes FERC's responsibility to propose a just reasonable methodology. And you can't have a just reasonable methodology that ignores two-thirds of our costs and doesn't even purport to claim any solution for them. Now, I only have a minute and a half before my rebuttal. I would like to talk for just very briefly about the transmission crediting issue. The transmission crediting issue deals with, if the court disagrees with me on my final submissions here, what the transmission credit makes sense for is that for certain, when the ex-embargo member has to pay under their approach the debt for the transmission debt that we got, they shouldn't have to pay again if they take transmission service and that portion of that service that pays for that same debt. We don't dispute that within the context of the flawed approach. But what can't happen- And that would be only in-network, right? Yes. It would be only in-network. Right. And what it- Okay. If you're- And I'm trying to understand your argument is that with respect to the out-of-network cost that there's no chance of double recovery on that. No chances of double recovery, and that's our argument in the second case. And we have a different, but related problem in the first case is they're allowing them to use the credit for the portion of the transmission payment that relates to services and not debt. So they're messing up both halves of the equation. So we have a methodology here that accounts for only one-third of our costs. And then within that, it essentially guffs what we're gonna get paid for transmission debt, which is 40% of the one-third. If I may reserve the balance of my time. You may. Good morning, your honors. Good morning. May it please the court. My name is Jessie Halpern, and I represent Basin Electric Power Cooperative, intervener in support of Tri-State Generation and Transmission Association, Inc., in these proceedings. Tri-State's counsel has already framed the case for the court. And I would like, during this time, to focus on the two, the eastern interconnection aspects of the methodology the commission established. The order on initial decision is, as Tri-State has explained, arbitrary and capricious, and as the commission itself has acknowledged in its order on the initial decision, incomplete, which means it cannot be the product of reasoned decision-making. In the order on initial decision, the commission states that it order, and I quote, leaves Tri-State and withdrawing members in a situation where an eastern interconnection member would have no resolution. Despite that recognition that its order was incomplete, the commission nonetheless directed Tri-State to use the commission's established methodology and provide binding contract termination payment estimates to all members, starting with the 2024 annual update. Given that the commission declined to address the issue of the Basin Electric Tri-State contract, that directive was an impossibility for Tri-State. Even if you ignore the procedural challenges to the subsequent orders, the fact remains that none of them provide an actionable process by which Tri-State could calculate the exit payment owed by a withdrawing member in the eastern interconnection. And this court should not permit the commission to place utilities or their customers in such an uncertain and unstable position. Council, can you help me understand how your position here as an intervener overlaps with what I understand to be ongoing litigation before the D.C. Circuit? The two proceedings are separate. The case before this court addresses Tri-State's contract termination payment methodology and whether the commission's orders establish a just and reasonable methodology, whether it's well-reasoned or arbitrary and capricious. The orders before the D.C. Circuit are, according to the commission, needed only to determine whether a reduction in Tri-State's requirements following a Northwest rural exit payment would cause Tri-State to breach the eastern interconnection contract with Basin Electric. And in the D.C. Circuit, the commission has stated that it did not need to determine what the terms of Section 9, which we've referenced in some of our briefs, should require, only that the reasonable terms and conditions didn't preclude Tri-State from implementing an exit methodology. Did Burke say... Oh, please, after you, Judge McHugh. Our case would have been inextricably intertwined in the sense that in order to determine the methodology, it's pretty relevant whether it's a breach, isn't it? I mean, you might have a good argument for a lost revenues methodology if, in fact, they're a breach. I would agree with that, but I would note that the commission's orders that the commission could have established a process for addressing this issue that was transparent and workable for Tri-State, its members, and for Basin Electric, but elected not to do so here. And so the commission early on in these proceedings determined that the Basin Electric Tri-State contract was irrelevant and simply declined to deal with it until you move on to the second set of orders that we're discussing today. And like the first set of orders, those rely on, those are problematic, and they're problematic because they rely on post hoc rationalization, and they also fail to afford full weight to certain key provisions of the Basin Electric Tri-State contract. That the commission, while attempting to rationalize the methodology it previously established in order on initial decision and related rehearing order, the commission failed to consider the reasonable terms and conditions language. And in saying that the decision in the complaint order was relevant, the commission contradicts its own discussion in the complaint order. My time is almost up, so I'd just like to finish by saying that this case begs for a complete reset. Vacating and remanding these proceedings would allow FERC the opportunity to reach a thoughtful and reasoned decision on an appropriate and actionable contract termination payment methodology that takes into consideration the totality of the relevant facts. Thank you, counsel. Thank you, your honors. Good morning. May it please the court. I'm Carol Banta for the Federal Energy Regulatory Commission. We've agreed to share, as you noted earlier, five minutes with Mr. Bay for United Power. I would like to begin with going back to the tri-state argument because it is the bulk of the case. And I wanna bring the focus back to the commission's role and responsibility under the Federal Power Act, and in particular, the necessary emphasis on cost causation. And I think this will tie to many of the court's questions to tri-state's counsel. Because I wanna talk briefly about cost causation and cost shifts. When the commission talks about cost shifts, it means that a withdrawing member must pay the cost incurred or obligated for its benefit. And that is its pro rata share of the collective costs. If other members end up paying some of that, it's a cost shift and that would not be just and reasonable. So that goes to the debt, which is not merely a snapshot. It encompasses the entire history up to that point. And represents the pro rata share of all the debt that has been undertaken to that point and some of the obligations for the future. When my friend talks about cost shifts, he's talking about the remaining members' shared operational costs going forward for service that they would still be receiving. So those costs may be spread over a smaller denominator. If a party is allowed to leave, which is another issue I wanna discuss. Once we've determined that a member can leave, then there may be fewer members and to the extent that costs are shared throughout the cooperative, the denominators can be smaller, just as when members join, the denominator gets larger and the costs go down. But they're not paying for the withdrawing member's share of anything because the withdrawing member is not causing those costs going forward. Tricy's theory of causation is if you would've been there contributing in that denominator and now you're not, that's cost causation and that's no definition of cost causation that the commission has used. You're not causing it except by your absence, they're sharing them differently. But that doesn't go to the Federal Power Act's cost causation principle. So that's why we seem to be talking past each other when the commission says this won't shift costs and the petitioners say, well our denominator's gonna be smaller. So of course costs might go up to the extent, of course again, it's very important that there is a two year period which didn't exist in Norwood or any of the other previous cases. There's a two year notice period in which everyone can adjust how they're going to operate going forward. And the ALJ took witness testimony from all the parties and considered a lot of the evidence and cited that evidence, certainly more than a scintilla, certainly meets standards for substantial evidence. And the commission explicitly relied on the work that its administrative law judge had done in corralling all that evidence and considering it and saying that you can right size your operations in two years. Which again, two year period is something that Tri-State itself had proposed. That a two year notice period would let everybody get a lot of work done in that time. And that goes to the other issue I wanted to address, one of the other issues I wanted to address about the ability to leave. And the suggestion that this case is about the commission's deciding that a member can leave the cooperative. That ship sailed a long time ago. Those are previous orders. I mean that's already being talked about in the show cause order that gave rise to this proceeding that we discussed in the background of both of our briefs. The hearing order that set this for the administrative law judge. When Tri-State chose and actually worked pretty hard to become FERC jurisdictional, FPA jurisdictional. One of the things that the commission came to early on is your bylaws say that you can leave but they don't say how. And one of the requirements of the Federal Power Act is transparency. You have to have procedures that are clear. And you have to have a calculation methodology that is clear and predictable so that parties can understand whether it's in their interest to leave, members can understand whether it's in their interest to leave or not. And maybe they wouldn't have had to do any of that if they weren't for jurisdictional. Because when we talked about the cooperative model and the commission did talk about this and I do want to point to a couple places in our order, in the commission's order, obviously. For instance, in what we've called the methodology of a hearing order, the May 23rd, 2024 order, paragraph 23, which we did cite, we may not have mentioned this sentence. But the last sentence cites back to something that's also in the first order, you can cross-reference it there, where the commission has found in yet another tri-state case that isn't before this court, that when we're talking about the cooperative economic model and the sharing of those costs, the commission has found that the characteristics of the cooperative business model itself do not justify departure from the well-established cost causation principles. So yes, cooperatives can be a different animal. And Congress recognized that 80 years ago when it exempted them from the Federal Power Act and the Rural Distribution Cooperative. And I'll note that all the parties in the case, except FERC, are rural cooperatives. It's not just tri-state, United Power is as well, and the other interveners on the commission's side. They're all, all those distribution cooperatives and public power districts are exempt from having to meet the cost causation standards under the Federal Power Act. And Congress had its reasons for that. But occasionally, and a generation transmission cooperative is a larger collective of the small ones. And as long as all the members are non-jurisdictional, so is the generation transmission cooperative. But for reasons that go beyond this case and into quite some history, sometimes a cooperative, like tri-state, decides it would rather be FERC jurisdictional. And it does something here, they let in members that don't qualify. So they took themselves out of the SPA jurisdiction. Well, now they're subject to the SPA standards. And FERC does cost causation all the time. And courts do cost causation all the time. It's not an aspirational principle. It is a core requirement of just and reasonable rates under the Federal Power Act. And the fact that you might have been able to do something that wouldn't meet those requirements under the cooperative model, well, if you're exempt from the Federal Power Act, we're not having this conversation at all. Councilor, can I ask, you just said that, you know, applying the cost causation principle is something FERC does all the time. But yet, as I read the briefs here, the methodology you came up with, I think was for the first time. So how can we square the argument or position that this is sort of rudimentary commission work with now saying we're gonna apply this new methodology that even though we've never said you can't do it, we've never done it before. It needs to be something new. Sure, and I didn't mean to suggest we've done this methodology all the time. It does, I mean, certainly the commission does have extensive expertise with the financing and operation of transmission and generation and all that. It's just that I was making the point that when we're talking about cost causation principles, which the commission gave a lot of thought and spilled a lot of ink on in this case, how to apply it here. And it is an unusual case. We don't have a lot of cases where we're setting an exit fee methodology for the kind of entity that most of the time is not within our jurisdiction, but this one is. So we're applying the principles that we always apply. And that's why the commission talked a lot about, and going back to what I was saying about what cost shifts are, and the commission talked a lot about trying to balance, making sure there isn't over-recovery and under-recovery. These are all the principles that the commission uses all the time. So yes, this is an unusual situation. We don't have a precedent for this. And none of the cases that Tri-State cited are precedential for this because none of them were setting an exit fee, a uniform exit fee methodology to be put in an SPA jurisdictional terrace going forward. But that doesn't mean the principles aren't the same and it doesn't mean that the commission's expertise and its administrative law judge's careful work doesn't apply a lot of the same things. Certainly the commission understands regulatory accounting, its reliance on its standardized form that I think pretty much possibly all of the FERC regulated entities use. It talked a lot about, we wanna make sure that the withdrawing member isn't overpaying. It's not just that. The commission also talked about even if it's not that withdrawing member overpaying, does this result in Tri-State over-recovering its costs in general, but also under-recovering. That was a huge part of the commission's analysis here was also making sure that Tri-State doesn't under-recover its costs. And that's why there's the emphasis on making sure the withdrawing member pays its pro rata share of all the debts and obligations, both generation and transmission, and dealing with that. Council, one of the principles that comes up in the briefs, particularly on Tri-State, is the idea that they need to be made whole. I'm going back to the first point you were discussing about when the denominator changes and the number of members, then the costs will differ. Does the commission, first as a principle, agree with this made whole argument? Which I think I know the answer to, but I'll let you say it. No, I mean, it is a model of breach damages, which the commission explicitly found doesn't apply. It's not about making sure that no remaining member ever pays a dime more than they would have if you had stayed. It's about making sure that the costs that the withdrawing member caused, the debts that were taken on to serve it, that it does not dump those costs on someone else. It bears those costs. So Tri-State, I think, is arguing that within the contractual relationship between the cooperative and its members, that if you look at the bylaws and energy services contracts, that you have to extract from that this made whole principle that the commission needs to respect that. So why is that argument? Right, well, as Your Honor noted, there isn't language that actually specifically requires that but I would point to what the commission did say here. And this is in the first order we're talking about, the methodology order, the order on admission decision. Paragraphs 28 through 230 is really where the commission grappled with that. And it looked at a section of what we're calling the WESCs, the requirements contracts. Section eight does not directly address the fee that a withdrawing member should pay. But it does mention paying a prorated portion of outstanding indebtedness on the notes as well as other obligations. And then in paragraph 229, the commission looks at the bylaws. And again, when Tri-State became jurisdictional, these bylaws that had just existed among the cooperatives now needs to be a tariff. It needs to be something that is public and transparent and approved by the commission. So we're looking at the bylaws in paragraph 229. Oh, I'm sorry, we're actually still on the WESCs. I think the bylaws may be in a different place, but in the, yeah, it's the preamble. In paragraph 229, the preamble to these requirements contracts that the commission was looking at, where it specifically mentions the financing of facilities being a shared obligation. So this is where the commission comes to the understanding that you cannot shift the cost of your prorated share of the debt. You have to pay your prorated share of the debt. And so the commission did look at all of that. So, I know we're running out of time before we also talk about the second case. And with respect to that, isn't it a decent argument that there will be some recovery on the out-of-network expenses? Because, yes, they can get some recovery if they continue on the in-network, but not on the out-of-network. So why is it appropriate to credit back all of that? Yes, yes, and where the commission really addressed that is in the last order we're discussing, that what we called the Compliance Rehearing Order of April 29th, 2025, in paragraphs 28 and 29. And that's where the commission, and we pointed in our brief that, that, actually, let me take you to a different order if you'll indulge me. The initial order that I was just talking about in a different part of it. In paragraphs, actually, we're leaping around among all these orders, it's the Methodology Rehearing Order, the May 23rd, 2024, that has language about, well, it's one of these two orders because the language about United Power having raised concerns, and the commission said these concerns, and in our brief we laid out, we said there were always two concerns. And one was a withdrawing member having to pay twice. But the other concern, well, we have three concerns because of the balance, and as I said, we're always concerned about making sure that Tri-State doesn't under-recover the no-stranded costs. That concern is on this side of the balance. But the commission said that there are two concerns on the other side of the balance. And one is that the withdrawing member doesn't, and I did find it, it is in the first order, and it is paragraph 564. And the commission was responding to United Power because United Power, of course, is concerned about the we're not double-paying part. But the commission says, divides this into two things, that there's recovering the cost twice, and that could be from anyone. And the second is making sure that the withdrawing member gets the full benefit of its prepayment so that it hasn't overpaid. So from the start, there were two concerns. And I know I'm actually maybe making this more confusing. It's not just about the withdrawing member paying twice. It's that you also are getting money from other places. And that's where we go to the last order where I actually had started with the compliance for hearing order. At paragraph 28-29. And the last sentence of paragraph 28 in particular, when the commission says, if you didn't credit the non-network amounts back, you would permit Tri-State to recover on debt on the non-network facilities, both from the withdrawing member and from its remaining members and its member rates. Because they're continuing to pay those going forward. And so you still could end up in a situation where Tri-State is double recovering. It's not, and it's not double recovering, like recovering more than just the actual cost that we want to make sure they don't under-recover. It is very confusing. A bit of a windfall to the withdrawing member? No, first of all, they only get. Do they get credit for something that they're not double paying? Well, they did pay it up front. And even if it's not, even if it's not in their OAT, I hate to use acronyms, their open access bills, they are still, if they're getting any credit at all, they are still using the facilities. And they've paid for some of the facilities that they needed to serve themselves, but they paid directly for those. That's addressed in paragraph 29 as well. So first of all, you don't. You just say some facilities, do you mean in-network? No, they're still benefiting from the non-network, is my understanding. And they paid for that in their original exit fees, right? Right. But there's no risk, as I understand it, and may be confused, that somehow Trusdate is going to receive a double payment from them for the non-network facility. And it's not. Am I understanding that correctly? I think you're understanding the arguments correctly, but it is not about double recovering it from the withdrawn member. It's about double recovering it at all. So you recovered the withdrawn member's share of that lump sum of the non-network transmission debt. And there's no argument that that is included in the prepayment, and certainly Trusdate was not confused about including it when it calculated, for instance, United Power's withdrawal. But those amounts are still being collected in the member rates that the members are paying. And so it is confusing. And it is also a bit of the tail wagging the dog because the numbers in the briefs reveal that the network facilities are something like four-fifths of that upfront payment. The non-network is a relatively small compared to the network facility number. And I do have those numbers, if the court wants them, but I think it was something like nearly a billion for the total transmission debt for networks, and then like 300 million, two or 300 million for the non-network. Lump sum, not what one member is prepaying. Yes? Trusdate's beginning argument was that they are under-recovering under your methodology because two-thirds of the costs don't show up on their balance sheet. What I'll call O and M, operation and maintenance time cost. Is that right? Well, what they're talking about, I don't know if that number's right, but I think it's probably right. But that is costs going forward, operating costs each year. It doesn't account for the fact that the withdrawn member paid its pro rata share of the debt before it left. This would be the amount that the remaining members are paying each year going forward. And again, that goes to the right-sizing issue and the ability to reduce those costs with a couple years of lead time. But in addition, what I started with, with the cost shift. If those ordinary costs of running the system and the insurance and whatever, whatever costs couldn't be right-sized are being shared among the members who are benefiting from those services going forward, but the denominator of how many members are sharing those costs has gotten smaller. That is not a cost shift. That is, in the commission's language, that's a function of membership. That just means the denominator goes up when you get more members and goes down when you get fewer members. But those costs of serving the system a couple years after a member withdraws aren't caused by that member. And Tri-State's theory is that it's caused by that member's absence of not being there to be in the denominator, and that's back to where we started. Does the withdrawing member pay off their fair share of all costs incurred before they withdraw? Yes, that is something, I believe it's on the date of withdrawal. They're given their exit fee amount when they give notice, and then they spend two years ironing out a lot of things, Tri-State downsizes or rightsizes, and the parties nail down exactly what they're doing about power purchase agreements, which is something that has not come up in this case, but was dealt with extensively before the commission. And at the end of the two years, you pay your lump-sum amount, which is quite substantial. And if you continue taking service as a customer, then over decades, you get some of that back. Although I do wanna make another point about the transmission crediting mechanism I didn't mention earlier. It's quite easy to forfeit some of that, because it is apportioned monthly, but if your monthly bill is less than the amount of your credit, the commission said, that's forfeited, that's it, Tri-State keeps that. But yes, you pay on the days that you leave. On the issue of the credit, not a lot of citation there to the record, as far as what the substantial evidence would be. It just is there, the credit. Can you respond to that, and say why we should say that there is substantial evidence to support the credit? Yeah, and I think that was largely United Power's argument in its petition that it withdrew, because it didn't especially like this either. In the first order, the commission talked about that the ALJ had taken proposals from everyone, and I believe only, I know trial staff had proposed including transmission debt up front. Not all the parties before the administrative law judge wanted to include transmission debt at all. They were just talking about generationally debt. And the administrative law judge said, no, you gotta include all debt. But we do have this potential for over-recovery, which we don't have with the generation assets, because you paid your share of that. Nobody else is using your share of that. There's no issue with that. But with transmission, there is an issue of potential over-recovery. And so the trial staff had proposed something that the commission just found too convoluted. It wasn't workable. It involved making projections into the future that just weren't- The offset. Yeah, the offset. So what we had in the record was everything about including transmission debt and having to find some way to prevent over-recovery. And I think that the commission's determination was largely based on just understanding the principles and mechanics of over-recovery and under-recovery and trying to balance those concerns. And it came up with something that, again, you can forfeit the credit if you don't use enough of the service going forward. That's balanced against the fact that you get the credit, but it takes decades because it's amortized over time. So it's a bit of maybe a rough balancing, but it was to solve a problem that no one had solved in a workable way, and some of the parties weren't even proposing something to resolve. But I do think that the potential weakness of the commission having come up with it itself was largely United Powers now withdrawing petition for review. I know I didn't get to Basin, but I think the court understands the issue well and that the D.C. Circuit has exclusive jurisdiction of the orders, which really did get into more than just there not being a breach. And the commission here was just saying, don't treat the exit fee as being based on a breach and follow what we've found in the other proceeding, which the commission knew about as early as the methodology rehearing order. Judge McHugh? I have one too, but I'll wait until after you. Just quickly, my understanding from, I don't remember which brief, is that maybe on the seventh compliance filing now at this point, in the second two consolidated appeals, we're reviewing, as I understand, orders from the second and third compliance filings. So if this process is continuing to be ongoing, I guess I'm just asking for our purposes because we're gonna have to decide and write an opinion. And do you anticipate these additional compliance filings and all this having, shifting this litigation at all? I think if the court were to affirm the commission's orders in the first, in the cases before you today, my understanding is, I think the disputes would largely go away. I would note there's yet another pair of cases before the court right now. Case number, let me say 259583 and 9594, but I'm not positive I'm right about that, that are in abeyance because I think everyone understands that they will be largely governed, if not entirely resolved by what the court does here. But yes, that goes to how much time, this was really a process where the commission put out so a lot of orders considering all aspects of this, but also has had to tell Tri-State a number of times when we met, when we said all, the full amount of the debt and the full-time value and including the non-network, we meant it the first, second and third time. And my question is a little bit, it sort of is the same, but a little more specific than Judge Santorico, which is if the D.C. Circuit were to rule that it is in fact a breach of the base and contract to withdraw before 2050, would you have to go back to the drawing board and redo everything again? I think that would only apply to Eastern Interconnection members, so it would be an unusual, I don't think it has to affect this case because here the issue was whether the commission had addressed the issue and the commission understood that there was a separate proceeding where that would get handled. If it got remanded to the commission, then the commission would look at it again. The Eastern Interconnection members have always been in a little different position because they have no generation debt. They're not making the kind of large payment upon exit that was really, the bulk of the concern here, and that was always the tricky thing about it. It is gonna be about that contract, but I don't think it has to affect this case even if it could affect what the methodology would be for some Eastern Interconnection members. I think that's my understanding. Thank you, counsel. Thank you. Thank you. Good morning. May it please the court. My name is Norman Bay and I represent United Power. United Power is a member owned, not-for-profit, a rural distribution electric cooperative located in the Northwest of Denver in the Front Range and has a service territory of 900 square miles. So I'd like to provide United Power's perspective on these proceedings. First, United Power exited pursuant to rate schedule number 281, which is a tri-state tariff, right? So United Power did not breach a contract. Instead, it sought to exit pursuant to the procedures delineated in rate schedule number 381. So there was no breach of contract, and that's why breach of contract damages are not applicable. Because rate schedule number 281 involved a rate, FERC had the obligation under the Federal Power Act to ensure that the process and the rate itself were just and reasonable. So in order to do that, FERC relied upon a fundamental principle, which is to say the principle of cost causation. Here, what FERC said was that tri-state should be compensated for the cost it had incurred to serve the member or was obligated to incur to serve the exiting member. So that's the principle that FERC applied. And what tri-state then did, though, was to propose a variety of ways of basically receiving compensation from the exiting member. In its brief, it insisted that the only possible path forward was based on the lost revenues approach. But in fact, in April 2020, tri-state's first proposal was called the mark-to-market make-whole methodology, which it rejected after FERC criticized it. I mean, tri-state withdrew it. And then it proposed what it called the modified contract termination payment approach. But even that had the lost revenues approach, the debt covenant obligation, or the higher of those two approaches. Although in this appeal, as Judge Phillips noted, they aren't even trying to defend the DCO or the higher of approach, even though they had presented an integrated methodology to the commission. In other words, Your Honor, they're cherry picking. They've changed the proposal they originally submitted to FERC. And as Judge McHugh noted, there is overreaching here because the total amount of payment would be $9 billion if all 42 members exited. If you were just to look at the members that did exit, for United Power, it would have been 1.6 billion. For La Plata Electric Association, would have been almost half a billion. And for Mountain Park Electric, it would have been, I think, 167 million. The total amount from those three members alone would have been 2.25 billion, which was 60% of the total debt of Tri-State. So yes, was there overreaching? Yes, and that's what the commission was reacting to. So what the commission did instead was to adopt an approach that it wanted to be transparent, replicable, and formulaic. Okay, and there's a very important note here. And why? Because transparency is very important and Tri-State had been unwilling to provide the exit fee to members who wanted to depart, okay? And so what FERC came up with was looking at the debt on FERC form number one. So in other words, it's data that's publicly available, reported by Tri-State, and then figuring out each departing members pro-rata share of that debt. Again, so that's transparent, replicable, and formulaic. When you look at the commission's April 29th, 2025 order, the commission says this, Tri-State, and this is in paragraph 32, Tri-State has repeatedly failed to comply with the commission's compliance directives and provided incorrect CT estimates to its members. And then it says, Tri-State's approach would potentially require further commission proceedings each year to verify the allocation factors. And the commission notes essentially that the administrative burden would also not be limited to the initial adoption of the CGP methodology. In other words, there would have been this enormous administrative burden if each time Tri-State came out with a number, there was collateral litigation, both at the commission and ultimately in the Court of Appeals. And so the commission came up with its approach, the balance sheet approach. Again, transparent, replicable, and formulaic. Now, Tri-State has made a number of arguments saying that it could not downsize or right-size its system, but that's why the commission agreed to Tri-State's proposal that there be this two-year notice period. That was Tri-State's proposal. And that notice period was to give Tri-State the opportunity to right-size its system. Tri-State did provide evidence at the hearing before the ALJ that said that about two-thirds of their costs were fixed costs, and one-thirds were O&M operations and maintenance-related costs, which was your question, Judge Schultz. Like, what are these costs about, right? Tri-State's saying that the two-thirds number was fixed costs but on the Seventh Circuit decision, MCI, the Seventh Circuit noted that in the long run, there are no fixed costs. All fixed costs are variable costs. What does the Seventh Circuit mean by that? United Power's witness, Geffert, testified that, and so this is all in the record, that what you do if you have a plant that's not recovering O&M is you either ramp back operations or you retire it or you accelerate its retirement. If a member has left, you don't go out and get a power purchase agreement to buy power for a member that's not there. There are things that you can do to reduce your fixed costs. You optimize your fleet. And the record also showed that of the eight power plants that Tri-State owned, three were going to close in the latter half of the 2020s or the 2030s. Only one plant was estimated to still be running by 2050. So some of these plants were old. By the way, there was a fourth plant that had a number of units, most of which were going to retire in the 2030s. Again, this is Tri-State's own evidence that they submitted to the commission before the ALJ. And so what do you do then if you've got these fixed costs? Well, you start doing what United Power's expert testified you would do. You start downsizing. You start basically mothballing units that are no longer economic, particularly if the power is no longer needed. Let me turn to the second issue, and that is the transmission credit. What the commission- Let me just interrupt you. You are over time. However, we understand, and I thought five minutes was awfully slim for United. We'll make it up to you on the backside with the rebuttal time. So please continue. Thank you, Judge Phillips. So now, United Power has made a payment of 627 million, even under the commission's methodology. $296 million of that amount was for transmission-related debt, for both OAT debt and the non-OAT debt. And the commission had encouraged exiting members either to buy their non-OAT facilities, which are the radial facilities, the lower voltage facilities, or to enter into use agreements. United Power bought its radial facilities. It paid 75 million. So for it not to get a full credit would have resulted in double counting. It'd be like buying a car, paying off the debt, right? And then buying the car again. And so there had to be some sort of allowance for that use of the payments that United Power made. But I also want to make a more important point, actually an overarching point about this transmission crediting mechanism. Again, the commission was trying to come up with something that was relatively straightforward. And it was not just trying to address this issue of double recovery of OAT debt. That misstates the commission's order. The commission was clear that it recognized that the exiting member was making this big payment. And so wanted the exiting member to receive the full benefit of its payment. It uses that phrase repeatedly in its orders. But what does Tri-State get out of it? It gets this huge upfront payment. It has a much lower risk that its facilities would be stranded, right? Because one thing the commission was worried about is once a member exits, would those Tri-State facilities be stranded? Well, by giving this big transmission credit, right? The member has every incentive to continue to use the Tri-State facilities, which is important because for the non-OAT facilities, the radio facilities, typically those only serve the exiting member, right? So the commission was actually mindful of Tri-State's concerns as trying to balance a number of considerations. It also gave Tri-State the benefit of the fact that the credit is forfeited if it's not entirely used. Okay, counsel, 30 seconds to wrap up, please. Okay, so what I would say, Judge Phillips, is that this court and Supreme Court have long noted that rate making is not a science. It's part science, but it's also part art. And the commission here was trying to come up with a process balancing a number of concerns in which its final rate would be just and reasonable. And the law is clear. A just and reasonable rate doesn't have to be a perfect rate. It doesn't have to be the best rate. It just has to be within the zone of reasonableness. And that's what the commission achieved by formulating this transparent, replicable, and formulated process. Thank you, Your Honor. Any questions I should ask? Thank you, counsel. All right, before you get started, counsel, let's adjust your clock. And I think to be fair and equal on the time, and I'm not saying you need to use it or that you want to use it, change it to 11 minutes. Thank you, Your Honor. That's very generous. I've got five points. I don't think it'll take 11 minutes unless there's questions from the bench. First, this absolutely remarkable effort to redefine what cost shifts have meant in every other context that FERC says. I mean, Norwood, that involved a tariff, an exit tariff. Wabash, an exit from a cooperative. And then broader reasoning, American Wind Energy. Cost shift always means leaving the remaining party no worse off. This artificial distinction that counsel FERC makes about cost shifts versus those that are remaining, doesn't make sense. Let me give you all an example. Let's say in an effort to right-size, because a lot of our members leave, we've got to shut down a mine or we've got to shut down a power plant. That's going to have environmental remediation costs. That's going to have compliance costs. That's going to have regulatory costs. Under their approach, our remaining members who didn't leave, who are not the reason this plant or mine is shutting down, they have to pay all of it. United, who gets out, times it, gets this windfall, has to, yes, pay none of it. Those facilities were built in part to serve United. United leaves, we have to shut them down because they left. Yet our members who didn't leave, who are left holding the bag, have to pay all of that. They're paying none of it. That is- Is that established that that's the reason that the plants would be shutting down? Well, that's what right-size would be. And they're telling us, they're telling the court that don't worry about the fact that we covered our eyes to two-thirds of their costs because there's going to be right-sizing. Well, first of all, and they were very careful, they're not saying it could all be right-sized away. But even the right-sizing itself, it's not costless. There's environmental remediation, there's compliance costs, there's regulatory costs. Their formula accounts for not one bit. And I'm going to say that again. Their formula accounts for not one penny. Counsel, I just thought I heard United Powers say that this hypothetical that you just proposed wouldn't actually happen because you wouldn't be left holding the bag to close down because they were still either going to use it or that they bought them. Maybe I misunderstood that. I mean, that's, I don't think that's what he was saying. But for example, I mean, we can talk about things not on the record. We had to shut down a mine. You know, that was used to get coal to serve them in part. There was significant environmental remediation on that. They paid not a penny for that. Our remaining members paid a penny. That's what the two-thirds is. It's stuff that the system was built to serve them. They were 20% of it. And now all the stuff, both the right-sizing we can do, they can't do, the risk of downsizing, the remaining members are holding the entire bag. Meanwhile, they get to have their own thing and they already made the economic decision that they're better off doing their own thing rather than honoring their 50-year contract. And then next, this right-sizing thing. Again, you heard Council for FERC say there's a lot of work that can be done in the two years. Yeah, there's a lot of work that's done for planning for what we do, for example, shutting down the mines, all the different, shutting down whatever plants we have. That's gonna happen in the long-term. But the actual shutdowns, the right-sizing, the risks of shutdowns, the right-sizing, those are the two-thirds of the costs that they're not accounting for one bit, that they get a free ride for, that we built the system to serve them in part. They get out, only pay one-third, leave the remaining members, the ones too small, the ones that are not serving the rich, growing suburbs of Denver, the ones serving folks in New Mexico, rural folks, they're left holding the bag while the rich folks in the suburbs of Denver get to get out and don't have to pay any of those two-thirds costs. I didn't hear a word from FERC or from United about the first point I raised, which is that the methodology here doesn't account at all, at all, for the number of years left on their voluntary, sophisticated commitment. Not saying it has to be exactly breach of contract damages, although I will note that the First Circuit in Norwood said that that's not a problem if the exit fee approximates that. But it is surely textbook, arbitrary, and capricious rulemaking to take a very important consideration, this was the core consideration that this court talked about, and it should show it, which is the number of years remaining, and give it zero weight. Not give it some weight, we use our discretion to give it 25% weight, but to give it absolutely no weight. To have the exact same payment calculation if you leave three years left or 40 years left. They didn't give that any weight that is clear, arbitrary, and capricious, and a sufficient basis to vacate. Didn't give it any weight in the sense that it never came up and it wasn't considered, or you just think that it deserved more attention than it got? They do not account for it in any respect, in their formula, in any respect. But was aware of it? It was aware of it, and it gave it, they created a methodology that gives it no weight. And their reason doesn't make sense for giving it no weight, for treating, and we put our hypothetical in our brief that they didn't respond to, you all can look at it, it just shows how absurd it is. To give that very important consideration, no weight in how the formula actually weighs. What was their reason? Their, well, they didn't give a reason, they said we want to do this other thing because it's more transparent or something, and because they didn't like the numbers. I just thought a moment ago you said their reason for not taking it into account didn't make sense. So I'm wanting to know. Yeah, well, so their reason is, well, the reason that they shifted to the balance sheet approach, which doesn't take it into account by definition, was patronage capital and the fact that they'll still be taking transmission. That's not a reason I've taken it into account. It doesn't have anything to do with anything. If you look at their brief, they said in their brief, the reason that we went the balance sheet approach, which is a balance sheet approach doesn't take this into account. The reason we went for it is because of patronage capital and because of the taking of the transmission credit, debt, a credential service after we leave. That has nothing at all to do with why you would not take this consideration into account. It's completely orthogonal. And briefly on the credit, they're saying, they quote this language in the order on ID that says that you should get the full benefit of the, they should get the full benefit of the credit, of the payment that they made. But that's just another way of saying that they shouldn't have to pay for transmission. That's what full credit means. And their only answer is, well, you might be able to forfeit it. Well, that just means that the big boys like United who have the big payments, who take a lot of transmission are gonna get the free ride. And this may be the smaller ones. They're not the ones not serving rural, not serving growing suburban Denver are gonna take some loss. But the saying that you should get the full benefit of transmission credit, why not give them the full benefit of the payment they made on generation then and let them credit away their entire payment. It makes no sense. It's just an assertion. And finally, I'd like to end kind of where my friends from United ended, which is just unreasonable. Taking a step back, we have a cooperative here. Everybody, including United, committed that they were gonna take all the requirements for 50 years. That was to fund not only the one third that's set, but the other two thirds and all the risks in between. There's no sense of just and reasonable where the remaining rural members in New Mexico get left holding the bag for those two thirds costs with their only answer from FERC being, well, some of it will be able to be right side. That is not just unreasonable. If the court doesn't like, doesn't think that, thinks that we overreached or whatever, don't rule for us in our 205 appeal. But surely on the 206 appeal, what was adopted here is not in the universe of just and reasonable. And for that reason, I would ask your honors to vacate the orders. Any questions? All right. Thank you, counsel. And thank all of you counsel for your helpful and excellent arguments. The case is submitted. Counselor excused.